**HARTFORD CASUALTY INSURANCE
COMPANY, Plaintiff,**

v.

**ARGONAUT–MIDWEST INSURANCE
COMPANY, Defendant.**

No. 82 C 2605.

United States District Court,
N.D. Illinois, E.D.

July 7, 1987.

**374**

Aaron J. Kramer and Mark E. Gralen, Schiff Hardin & Waite, Chicago, Ill., for plaintiff.

Stanley A. Walton, III, Winston & Strawn, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Pending are cross-motions for summary judgment. For the following reasons, we deny Plaintiff's motion and grant Defendant's motion.

### Facts

This lawsuit arises like a phoenix from the ashes of an earlier lawsuit in the Circuit Court of Cook County, Illinois, *Tannebaum, et al. v. Northwest Hospital, Inc., et al.*, No. 75 L 21023. In this action, the plaintiff Hartford Insurance Company ("Hartford") claims that it is entitled to recover from the defendant Argonaut-Midwest Insurance Company ("Argonaut") $1,000,000 of the $5,000,000 which Hartford paid to settle the *Tannebaum* case. Argonaut also contributed to that settlement in the amount of $3,000,000.

The plaintiffs in *Tannebaum* were Eileen Tannebaum ("Tannebaum") and her husband Louis Tannebaum; the defendants included Northwest Hospital ("Northwest"), Dr. Arthur Broder ("Broder"), nurse Norma Nicola ("Nicola"), and Dr.

Murray Rosenberg ("Rosenberg"). Mrs. Tannebaum underwent reconstructive rhinoplastic surgery at Northwest on April 14, 1975. Broder performed the surgery on Tannebaum, Nicola administered anesthesia to her and Rosenberg saw her on a post-operative basis. Shortly after the surgery, Tannebaum became a quadriplegic. (Agreed Facts Re Summary Judgment ("Agr."), ¶ 4).

The lawsuit filed by attorney John Hayes ("Hayes"), on behalf of the Tannebaums, charged medical malpractice by Drs. Broder and Rosenberg and negligence by Northwest and nurse Nicola. All Defendants promptly notified their respective insurance carrier(s) of the *Tannebaum* lawsuit.

Hartford insured Drs. Broder and Rosenberg. Hartford had issued two different policies covering Broder for professional liability, one in Broder's name and one in the name of Broder's professional corpora-

tion. Each policy afforded Broder $5,000,000 in coverage (Agr. ¶ 6).[1] Hartford had issued one policy covering Rosenberg for professional liability. The limit of liability afforded to Rosenberg by Hartford was $1,000,000.[2]

Argonaut insured Northwest under two separate policies. The first (the "Primary Policy") was primary insurance affording Northwest and its employees $1,000,000 in coverage for negligent treatment of patients (Agr. ¶ 2).[3] Argonaut, in this action, has stipulated that both Nicola and Rosenberg were employees of Northwest on April 14, 1975, the date of the Tannebaums' injuries (Agr. ¶ 2). Hence, Northwest, Nicola and Rosenberg were insured under the Primary Policy. However, Nicola's coverage was limited to the aggregate $1,000,000 coverage available to Northwest, while Rosenberg's $1,000,000 coverage under the Primary Policy was separate from, and in

1. Although neither policy issued by Hartford to Broder is included in the record, the parties treat Broder's personal policy as one for primary coverage (Murphy Dep. 8, 45). Hartford defended Broder, and the duty to defend falls upon the primary carrier. *Western Casualty & Surety Co. v. Western World Ins. Co.*, 769 F.2d 381, 385 (7th Cir.1985); *Occidental Fire & Cas. Co. of N. Carolina v. Underwriters at Lloyds, London*, 19 Ill.App.3d 265, 311 N.E.2d 330 (1st Dist.1974). We can safely assume that the personal policy Hartford issued to Broder was Broder's policy of primary coverage, and that the amount of primary coverage was $5,000,000. We are unable to ascertain the scope or character of Broder's coverage under the policy issued in the name of Broder's professional corporation. We assume that policy offered excess or secondary coverage. *See* n. 17, *infra*.

2. The policy Hartford issued to Rosenberg is also not part of the record. However, the parties stipulate that the terms of the Hartford policy imposed on Hartford the primary duty to defend Rosenberg (Agr. ¶ 4).

3. The Primary Policy was a general liability policy issued to hospitals. Part IV of the policy covered hospital professional liability. The other parts of the policy, not relevant to the instant lawsuit, provided Northwest with Comprehensive General Liability coverage, Comprehensive Automobile Liability coverage, Contractual Liability coverage, etc.
Part IV of the Primary Policy insured Northwest for:

all sums which the insured shall become legally obligated to pay as damages because of injury to any person arising out of the rendering of or failure to render, during the policy period, the following professional services: (a) medical, surgical, dental or nursing treatment to such person....
The printed body of the Hospital Professional Liability portion of the Primary Policy provided that:
[e]ach of the following is an insured under this insurance to the extent set forth below: (a) the named insured; [and] ... (c) if the named insured is designated in the declarations as other than an individual or partnership, any executive officer, stockholder or member of the board of trustees, directors or governors of the named insured while acting within the scope of his duties as such.
A standard "Additional Interest Endorsement" to the Primary Policy provided:
It is agreed that the unqualified word "insured" also includes (1) any employee or authorized volunteer worker of the named insured while acting within the scope of his duties as such ... subject to the following provisions:

. . . . .

D. If any employee [or] authorized volunteer worker ... has another policy or policies covering a loss insured hereunder, the insurance with respect to such loss under this policy shall be excess over the amount set forth as the limit of liability under such other policy or policies.

addition to, the $1,000,000 coverage of Northwest.[4]

 The second policy issued by Argonaut to Northwest was a policy of secondary or excess insurance (the "Umbrella Policy"). The Umbrella Policy provided Northwest with an additional $2,000,000 in coverage over and above the $1,000,000 coverage afforded under the Primary Policy (Agr. ¶ 3).[5] The parties dispute whether the Umbrella Policy afforded any additional coverage for Rosenberg. While resolution of this question is not crucial to the ultimate outcome in this case, we find that the Umbrella Policy explicitly excludes employees of Northwest[6] and thus neither Rosenberg nor Nicola received any additional coverage under the Umbrella Policy.

Thus, at the time of the *Tannebaum* suit, Hartford offered $6,000,000 in primary coverage—$5,000,000 for Broder and $1,000,000 for Rosenberg, and $5,000,000 in excess coverage for Broder. Argonaut offered $2,000,000 in primary coverage—$1,000,000 for Northwest and $1,000,000 for Rosenberg, and $2,000,000 in excess coverage for Northwest.[7]

4. Section E of the Additional Interest Endorsement to the Primary Policy provided:
 Solely with respect to the insurance afforded by this endorsement, Part III, Limits of Liability of the Hospital Professional Liability Insurance Coverage Part, is amended to read:
 III. Limits of Liability:
 (a) Regardless of the number of insureds under this insurance, the company's liability, except with respect to licensed physicians and surgeons employed by the named insured, is the limit of liability stated in the schedule as applicable to "each claim" for all damages because of each claim or suit covered hereby. The limit of liability stated in the schedule as "aggregate" is, subject to the above provision respecting "each claim," the total limit of the company's liability for all damages.
 (b) With respect to licensed physicians and surgeons employed by the named insured the limits of liability apply as in paragraph (a) above except such limits of liability shall apply separately to each licensed physician or surgeon employed by the named insured.

5. The Umbrella Policy provided, in part:
 I. Coverage:
 The company will indemnify the insured for all sums which the insured shall become legally obligated to pay as damages or expenses, as hereinafter defined as included within the term ultmate net loss, by reason of liability
 (a) imposed upon the insured by law ... because of
 (i) personal injury caused by ... an occurrence which takes place during the policy period anywhere in the world.
 II. Limits of Liability:
 The company shall be liable only for ultimate net loss resulting from any one occurrence in excess of either
 (a) the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies ... hereinafter called the underlying limit, or
 (b) if the insurance afforded by such underlying insurance is inapplicable to the occurrence, the amount stated in the declarations as the retained limit.

6. The printed body of the Umbrella Policy provides that anyone who was an insured under an underlying policy would be an insured under the Umbrella Policy. However, a limiting endorsement was attached to the Umbrella Policy. This endorsement is reprinted here in full:
 *Hospital Professional Liability Limitation.*
 Notwithstanding anything contained herein to the contrary, it is agreed that this policy shall not apply with respect to hospital professional liability to any claim for loss or expense for which insurance is not afforded by the underlying hospital professional liability policy or by any renewals or replacements thereof.
 It is further agreed that the definition of "named insured" and "insured" shall be amended to read:
 "The unqualified word 'insured' wherever used includes the named insured and also each member of the named insured's board of trustees, directors or governors while acting within the scope of his duties as a member of such board."
 When a provision in an endorsement or a rider conflicts with a provision in the printed body of the policy proper, the terms of the attached endorsement will control. *Protective Ins. Co. v. Coleman,* 144 Ill.App.3d 682, 98 Ill.Dec. 914, 494 N.E.2d 1241 (2d Dist.1986). The endorsement to the Umbrella Policy here is unambiguous—it clearly states that it is intended to *amend* rather than *supplement* the definition of "insured." The use of the word "includes" does not necessarily mean that others are insureds as well; Argonaut used the phrase "also includes" when an endorsement was intended to expand coverage. *See* n. 3, *supra.* We conclude the Umbrella Policy did not cover anyone not listed in the endorsement as an "insured."

7. Rosenberg's policy with Argonaut, the Primary Policy, was a policy of primary insurance. The policy contained an "excess clause," that is, a clause declaring the coverage offered by the policy to be excess over any other valid insurance held by the insured. *See* n. 3, *supra.* Only

When Broder tendered defense of the *Tannebaum* suit to Hartford, Hartford acknowledged coverage and retained Richard G. French ("French") to defend him (Agr. ¶ 8(a)). When Rosenberg tendered defense of the *Tannebaum* suit to Hartford, Hartford acknowledged coverage and retained Jerome N. Groark ("Groark") to defend him (Agr. ¶ 8(c)). Argonaut, contrary to its present admission that Rosenberg was an employee of Northwest, refused to acknowledge coverage of Rosenberg on the grounds that he was an independent contractor (Zahour Dep. 34, 37; Sullivan Aff. Exh. 6). Argonaut did acknowledge coverage under the Primary Policy for Nicola and Northwest, and under the Umbrella Policy for Northwest only. Argonaut hired John D. Cassiday ("Cassiday") to defend both Nicola and Northwest (Agr. ¶ 8(b)).

All attempts to settle the *Tannebaum* case before trial failed (Agr. ¶ 11). The case went to trial before Judge Lerner in the Circuit Court of Cook County. At trial, Cassiday, representing Northwest, attempted to prove that Rosenberg was neither an agent nor an employee of Northwest (Agr. ¶ 10). Cassiday's reason for adopting this strategy is clear—if Rosenberg was not an agent or employee of Northwest, Northwest could not be held liable for the Tannebaums' injuries on a theory of *respondeat superior*. Cassiday's position at trial was in the teeth of repeated demands by Rosenberg's counsel that Argonaut acknowledge coverage for Rosenberg. These demands were made before, during, and after trial. For instance, on January 20 and February 6, 1981, Groark (representing Rosenberg under the Hartford policy) stated on the record in pretrial hearings that Rosenberg was entitled to coverage under both of the Argonaut policies (Agr. Exh. 8). Groark repeated his demand on April 22, 1981, at the

close of Plaintiffs' case (Groark Aff. ¶ 6).[8] In addition, David Letvin, independent counsel retained by Rosenberg, wrote to Argonaut demanding that an offer of settlement be made on behalf of Rosenberg (Agr. Exh. 4). Argonaut refused all these demands. Cassiday's trial strategy failed, and before submitting the case to the jury Judge Lerner ruled that Rosenberg was an "agent" of Northwest as a matter of law (Agr. ¶ 10). Judge Lerner did not decide whether Rosenberg was an "employee," a fact Argonaut now admits, because that question was not essential for the *Tannebaum* case. (*Id.*)

On or about May 4, 1981, the jury returned a verdict on behalf of the Tannebaums and against Broder, Rosenberg, and Northwest, jointly and severally (Nicola was found not liable) in the amount of $9,000,000 ($6,500,000 for the injuries suffered by Tannebaum; $2,500,000 on behalf of her husband). Judgment was entered on the jury's verdict (Agr. ¶ 13).

On June 5, 1981, Thomas P. Sullivan ("Sullivan"), Rosenberg's new counsel, wrote to Argonaut asserting that the evidence in the *Tannebaum* trial proved that Rosenberg was a physician employed by Northwest and entitled to coverage under the Argonaut Policies (Sullivan Aff., Exh. 1). Sullivan demanded that Argonaut either offer to contribute a sum sufficient to allow Rosenberg to settle with the Tannebaums without appeal, include Rosenberg in a meaningful settlement with the Tannebaums, or post a supersedeas bond for an appeal by Rosenberg. (*Id.*) On June 10, 1981, James L. Zahour ("Zahour"), the claims manager of Argonaut's Chicago office, responded to Sullivan, saying "[w]e have consistently maintained our position that Dr. Rosenberg was not an employee of the hospital in April, 1975, before, during

---

as far as Rosenberg was concerned did the Primary Policy offer secondary coverage. We shall continue to treat the Primary Policy as offering primary coverage to all persons insured thereunder for ease of discussion; whether we call the coverage offered by the Primary Policy to Rosenberg primary or excess does not affect our final analysis.

8. At the close of Plaintiffs' case, defense counsel presented an offer of settlement in the amount of $3,500,000. The offer consisted of $1,000,000 from Rosenberg's policy with Hartford, $1,400,000 from Argonaut ($400,000 of which came from the Umbrella Policy), and the balance ($1,100,000) from Broder's policy with Hartford. This offer was rejected by Plaintiffs and their counsel (Groark Aff., Exh. 3).

and since the trial" (Sullivan Aff., Exh. 2). Zahour further stated that Argonaut had already offered the policy limits to Hayes, so Argonaut could do nothing more for Rosenberg than it had already done. (*Id.*) On June 12, 1981, Sullivan replied to Zahour, asserting that Argonaut had not, in fact, tendered its full policy limits on Rosenberg's behalf because under the terms of Additional Interest Endorsement, Rosenberg was entitled to additional coverage (Sullivan Aff., Exh. 3). Sullivan threatened to sue Argonaut for compensatory and punitive damages, presumably on a "bad faith" theory of liability, if any of Rosenberg's personal assets were seized to satisfy the judgment. (*Id.*)

Sullivan was simultaneously in communication with Hartford. Sullivan charged that during the *Tannebaum* trial, Hartford had subordinated Rosenberg's interests to Broder, Hartford's other insured, in an attempt to minimize its liability. Sullivan stated he recently learned that Argonaut had been negotiating a "loan receipt agreement" with plaintiffs for $3,000,000 and that plaintiffs would settle with Hartford for $6,000,000. Sullivan demanded that Hartford accept the $6,000,000 settlement proposal or in some other way work out an arrangement with plaintiffs so that plaintiffs would not seize Rosenberg's personal assets (Murphy Dep., Exh. 6).

Between May 4 and June 18, 1981, everyone interested in the *Tannebaum* case attempted to work out a settlement. Hayes, on behalf of plaintiffs, offered to accept $8,000,000 in cash from any of the defendants or any of the insurers to settle the $9,000,000 judgment (Agr. ¶ 16). Hayes said he did not care which insurer or which defendants paid the money, as long as his clients were paid (Hayes Dep. 8). Nevertheless, progress on the settlement reached an impasse. Argonaut offered $3,000,000 on behalf of Northwest only ($1,000,000 primary and its entire excess coverage of $2,000,000) and Hartford offered $4,000,-

000 ($3,000,000 on behalf of Broder and its policy limits of $1,000,000 on behalf of Rosenberg). The combined offers of $7,000,000 were $1,000,000 short of the amount required to settle with the Tannebaums. Hayes then issued citations to discover assets to Rosenberg and other defendants (Agr. ¶ 14). When the impasse continued, Hayes threatened to levy against Rosenberg's personal assets to satisfy the judgment.

■ Sullivan, on behalf of Rosenberg, began negotiations with Hartford designed to convince Hartford to pay the $1,000,000 shortfall. Sullivan succeeded and on June 18, 1981, Hartford agreed to pay an additional $1,000,000 to the Tannebaums on Rosenberg's behalf in return for Rosenberg's assignment to Hartford of his rights under the Argonaut Policies (Sullivan Aff., ¶ 14; Exh. 8).[9] The same day, in open court, Hartford announced its agreement with Rosenberg and its intention to pay a total of $5,000,000 to the Tannebaums (French Aff. ¶ 10). Argonaut, without comment on the Hartford position, confirmed its previous offer of $3,000,000 on behalf of Northwest and the *Tannebaum* case was settled. However, Hartford had laid the foundation for the instant suit against Argonaut.

Hartford and Argonaut have stipulated that Hartford allocated its $5,000,000 payment as follows: $3,000,000 on behalf of Broder, $1,000,000 for Rosenberg under his policy with Hartford, and $1,000,000 for Rosenberg in consideration for his assignment of his claims against Argonaut (Agr. ¶ 17(a)-(c)). The parties also stipulate that Argonaut paid $1,000,000 on behalf of Northwest under the Primary Policy and $1,000,000 on behalf of Northwest under the Umbrella Policy (Agr. ¶ 17(d)). Hartford and Argonaut dispute Argonaut's allocation of the final $1,000,000. Argonaut claims that the $1,000,000 payment was made on behalf of Rosenberg under the

---

9. Argonaut claims the assignment did not occur until June 24, 1981. The assignment was entered into on June 18, 1981, when the parties came to agreement even though the assignment was not reduced to writing and formally exe-

cuted until June 24, 1981. Oral assignments of choses of action are valid in Illinois. *Buck v. Illinois Nat. Bank & Trust Co.,* 79 Ill.App.2d 101, 223 N.E.2d 167, 169 (2d Dist.1967).

Primary Policy. Hartford claims any such allocation by Argonaut to Rosenberg was a nullity because of Argonaut's consistent denial of coverage to Rosenberg and because of Argonaut's knowledge that Hartford was relying on the $1,000,000 coverage of Rosenberg by Argonaut when it paid its $5,000,000 (Agr. ¶ 17(e)). Alternatively, Hartford asserts that even if the Argonaut is permitted to make such an "after the fact" allocation to Rosenberg, Argonaut should be required to pay Hartford's claim from the Umbrella Policy which was not exhausted by the settlement.

In essence, Hartford claims its receipt of an assignment of Rosenberg's claims against Argonaut entitles it to recover from Argonaut the additional $1,000,000 it paid to settle the *Tannebaum* suit.

### Law

■ Hartford is a New Jersey corporation with its principal place of business in Connecticut while Argonaut is an Illinois corporation with its principal place of business in Illinois (Agr. ¶ 1). Jurisdiction is properly based on diversity, 28 U.S.C. § 1332(a). We assume that the law of the State of Illinois governs this action, as the *Tannebaum* suit took place in Illinois, the Rosenberg assignment was made in Illinois and all of the insureds were Illinois residents. Both Hartford and Argonaut are seeking summary judgment and, finding no genuine issue of material fact, we agree that judgment is appropriate. Fed.R.Civ.P. Rule 56.

The decision in this case has been made unusually difficult by the failure of Hartford and Argonaut to agree on what issues are presented by the stipulated facts. Hartford envisions its claim to be governed by the law of assignments. Its argument is simply that (a) Argonaut wrongfully refused Rosenberg coverage, (b) Hartford obtained an assignment from Rosenberg of his claim against Argonaut, (c) Hartford relied on the Rosenberg assignment in contributing an additional $1,000,000 to the *Tannebaum* settlement, and (d) Argonaut knew of Hartford's reliance. Hartford argues that its recovery may be made from Argonaut's Primary Policy covering Rosenberg because Argonaut's after-the-fact allocation of the proceeds of that policy to the settlement is not binding on Hartford. Hartford also argues that even if the subsequent allocation to Rosenberg under the remaining policy is permitted by this court, it may still recover the $1,000,000 from Argonaut's Umbrella Policy which Hartford contends covered Rosenberg. (As noted above, we have rejected the latter argument. *Supra*, p. 376.)

Argonaut, on the other hand, claims that the core of the dispute is the validity of the assignment from Rosenberg to Hartford. Argonaut claims the assignment is void because Argonaut did not consent to it, and consent is necessary for an assignment to be valid. Moreover, Argonaut argues that the assignment is a sham because Hartford, in order to effectuate the settlement, had "internally committed" to paying the extra $1,000,000 out of Broder's policy before agreeing to accept Rosenberg's assignment. Argonaut also argues that it has fulfilled any duties it had to Rosenberg because Argonaut as a part of its settlement of the *Tannebaum* case obtained a release for Rosenberg. Argonaut concludes that since Rosenberg was fully protected by the settlement, he has no cause of action against Argonaut and, thus, Hartford as Rosenberg's assignee has no cause of action either. Neither side presents any meaningful precedent for their respective positions.

■ In order to sort out the competing claims and considerations presented by the parties, we will begin with an examination of the arguments presented by Argonaut. Argonaut claims that the Rosenberg assignment to Hartford is void because Argonaut, under the terms of its policy with Rosenberg, could not be bound by such an assignment in the absence of its written consent. Argonaut relies on certain language contained in the general conditions of its policy, clause 9, which provides, "[a]ssignment of interest under this policy shall not bind the company until its consent is endorsed thereon." Such language, how-

ever, only prohibits assignment of policy coverage, not assignment of an accrued cause of action. *Maneikis v. St. Paul Ins. Co. of Illinois,* 655 F.2d 818, 826 (7th Cir. 1981) (applying Illinois law); *Brown v. State Farm Mut. Auto Ins. Assoc.,* 1 Ill. App.3d 47, 272 N.E.2d 261, 264 (4th Dist. 1971). Here, there is no question that Rosenberg assigned an accrued cause of action; a cause of action existed from the time that Rosenberg first demanded that Argonaut acknowledge coverage of him prior to trial in the *Tannebaum* case. After the jury verdict in *Tannebaum* against him, Rosenberg had what is now admitted by Argonaut to have been a valid claim for $1,000,000 in coverage from Argonaut.

At this point we dispose of two of Argonaut's arguments. Argonaut contests the Rosenberg assignment to Hartford on the grounds that Hartford was "internally committed" to paying an additional $1,000,000 on behalf of Broder before accepting the assignment. Argonaut also argues that after the settlement it actually paid $1,000,000 on behalf of Rosenberg in its settlement checks (writing a check for $2,000,000 for Northwest and $1,000,000 for Rosenberg instead of $3,000,000 for Northwest). We believe that Illinois principles of estoppel preclude both arguments.

█ As set forth above, Hartford had previously offered $4,000,000 as its share of a proposed $8,000,000 settlement with the Tannebaums—$3,000,000 for Broder and its entire policy limits of $1,000,000 for Rosenberg. Argonaut had offered $3,000,000 *solely* for Northwest while denying the existence of any coverage for Rosenberg. With negotiations at an impasse, Hartford announced in open court and in the presence of Argonaut's attorneys that it had accepted an assignment from Rosenberg and, based on that assignment, would advance another $1,000,000 toward the settlement. Such a statement and conduct clearly put Argonaut on notice that Hartford would attempt to recover the $1,000,000 by demonstrating that Rosenberg was in fact an employee of Northwest. Argonaut did not object or withdraw its offer after Hartford's announcement but, in fact, made its

$3,000,000 payment, thereby completing the settlement of the *Tannebaum* case. Under such circumstances, Argonaut may not now argue that the assignment was a sham because Hartford had already internally committed to paying an extra $1,000,000 out of Broder's policy. Nor may Argonaut later change its own position and pay part of its $3,000,000 contribution by allocating it to Rosenberg. Under Illinois law, estoppel arises when one party relies on the word or conduct of another, so that the party changes his position and subsequently suffers harm. *Gary-Wheaton Bank v. Meyer,* 130 Ill.App.3d 87, 85 Ill.Dec. 180, 473 N.E.2d 548 (2d Dist.1984). More specifically, Argonaut is estopped because its conduct induced Hartford to believe that Argonaut would not recognize the validity of the Rosenberg claim against it. Hartford, at the time of the settlement, was correctly convinced that Rosenberg had a valid claim against Argonaut and in accepting Rosenberg's assignment changed its position by agreeing to contribute an additional $1,000,000 on behalf of Rosenberg. Argonaut was advised of Hartford's reliance on the Rosenberg assignment and completed the settlement still insisting Rosenberg was not an employee of Northwest. Argonaut is thus estopped to argue on the basis of bookkeeping entries that it has fulfilled its obligations to Rosenberg by paying $1,000,000 on his behalf.

█ Argonaut's final argument is that because Rosenberg obtained a release as a result of the settlement, Argonaut has discharged or fulfilled all of its duties to Rosenberg. Such a contention is easily dismissed. Argonaut never fulfilled any duties that it had to Rosenberg as an employee of Northwest; the release was obtained by Rosenberg only because Hartford was willing to accept the Rosenberg assignment.

█ The real question presented is not whether Rosenberg could assign his claim but whether Rosenberg could assign his claim to *Hartford.* Principles of estoppel do not affect the validity of the assignment from one insurer's policyholder to another coinsurer. Such validity depends on Illi-

nois law, and not facts known to Argonaut or Hartford at the time of the assignment. Illinois recognizes the validity of an insured's assignment to a *judgment creditor* of his cause of action against his insurer. *McHenry Hospital v. Metropolitan Life Ins. Co.*, 578 F.Supp. 122, 126 (N.D.Ill.1983) (Will, J.). The rationale for the rule rests on a policy to encourage insurers to pay legitimate claims on behalf of their insureds. Appropriate incentives to comply with the Illinois policy are created by permitting those who have incurred loss to accept an assignment from the insured. Thus, under Illinois law, after the verdict in the *Tannebaum* case, Rosenberg could have assigned his claim against Argonaut to the Tannebaums. Under such a scenario, the Tannebaums could have accepted the $7,000,000 payment from Hartford and Argonaut and sued to recover an additional $1,000,000 under the Rosenberg policy with Argonaut via an assignment of Rosenberg's claim.[10] Hartford, however, even after the jury verdict in the *Tannebaum* case, was not a judgment creditor of Rosenberg. Hartford was a coinsurer with Argonaut and its insureds (Broder and Rosenberg) were jointly and severally liable for a $9,000,000 judgment.

■ In the absence of any known Illinois precedent on the issue presented here, we examine Illinois law establishing the rights and duties between coinsurers. An insurer in Hartford's situation (that is, an insurer of loss with a recalcitrant coinsurer), is not required to pay the entire amount of the judgment while the recalcitrant insurer escapes scot-free. Illinois allows an insurer who has paid more than its appropriate share to recover under the terms of the covering policies from a coinsurer which is also responsible for the loss

but has refused to pay its fair share. *Royal Globe Ins. Co. v. Aetna Ins. Co.*, 82 Ill.App.3d 1003, 38 Ill.Dec. 449, 451, 403 N.E.2d 680, 682 (1st Dist.1980); *Western Cas. & Sur. Co. v. Western World Ins. Co.*, 769 F.2d 381, 383 (7th Cir.1985). The rationale is one of public policy—encouraging all carriers to participate in the initial proceedings, and requiring that all insurance carriers which have insured against a loss share the obligation to pay it. *Western Cas.*, 769 F.2d at 383.

■ But for the assignment taken from Rosenberg, Hartford was in precisely that position. Argonaut wrongfully refused either to contribute towards a settlement, or engage in settlement negotiations with the Tannebaums on behalf of Rosenberg. In order to consummate the settlement, Hartford paid an additional $1,000,000, making up the shortfall between Hayes's demand and the total of its offer of $4,000,000 and Argonaut's offer of $3,000,000. Thus, under Illinois law, Hartford is entitled to apportion responsibility for the loss among all the insurers and recover from Argonaut any excess which it has paid over its share of the settlement.

■ Hartford's contention, that because it has an assignment of rights from Rosenberg it can recover the entire amount it claims to have paid on Rosenberg's behalf rather than the amount in excess of its equitable share of the settlement, is incorrect. We have not discovered, nor have the parties drawn our attention to, any case in which an insured's assignment of rights against one insurance company to a second enabled the second to recover from the first when both are jointly and severally liable for the judgment.[11] We believe Illi-

---

**10.** In this hypothetical scenario, the Tannebaums may have been able to recover $2,000,000 from Argonaut (the difference between the judgment and the $7,000,000 received) for Argonaut's bad faith refusal to settle. *See Phelan v. State Farm Mut. Auto. Ins. Co.*, 114 Ill.App.3d 96, 69 Ill.Dec. 861, 448 N.E.2d 579, 585 (1st Dist.1983).

**11.** Hartford cites in support of its position the following cases: *In Re Estate of Martinek*, 140 Ill.App.3d 621, 94 Ill.Dec. 939, 488 N.E.2d 1332

(2d Dist.1986); *Maneikis v. St. Paul Ins. Co. of Illinois*, 655 F.2d 818 (7th Cir.1981); *Aabye v. Security-Connecticut Life Ins. Co.*, 586 F.Supp. 5 (N.D.Ill.1984) (Aspen, J.); *Browning v. Heritage Ins. Co.*, 33 Ill.App.3d 943, 338 N.E.2d 912 (2d Dist.1975); and *Brown v. State Farm Mut. Auto. Ins. Assoc.*, 1 Ill.App.3d 47, 272 N.E.2d 261 (4th Dist.1970).

Each of these cases is distinguishable in that none involved an assignment by an insured to an insurer jointly liable for an obligation with the insured/assignor's insurer. *Martinek* was a

nois law would not sanction such a result. Illinois has created a remedy for insurers whose coinsurers wrongfully deny coverage—an action for equitable contribution. *See Royal Globe*, 38 Ill.Dec. at 451, 403 N.E.2d at 682. Allowing an insurer like Hartford to employ an assignment to recover the full amount of the coinsurer's insured's limits of liability may very well enable the settling carrier to obtain greater rights against the second carrier than those provided under the Illinois equitable contribution doctrine. It would encourage an insurer to negotiate with its coinsurers' insureds rather than with coinsurers. It would discourage attempts to convince the coinsurer that coverage for the insured exists. Permitting an assignment in an attempt to shift the loss disproportionately among responsible carriers promotes litigation rather than resolves it. In other situations, Illinois courts bar assignments which are against public policy. *Cf. Klubeck v. Division Medical X-Ray, Inc.*, 108 Ill. App.3d 630, 64 Ill.Dec. 255, 439 N.E.2d 506 (1st Dist.1982) (assignment of right to receive welfare reimbursements); *Clement v. Prestwich*, 114 Ill.App.3d 479, 70 Ill. Dec. 161, 448 N.E.2d 1039 (2d Dist.1983) (cause of action for malpractice).

We believe that Rosenberg's assignment to Hartford of his claims against Argonaut cannot impose greater liability upon Argonaut than Argonaut incurs under existing Illinois law because the assignment is void as against public policy. A recalcitrant insurer remains liable for its fair share of the loss. To accept Hartford's argument would mean that an insurer through the simple device of assignment from another carrier's insured may ultimately pay less than its equitable share in any settlement. We decline to hold that an insurer—even one like Hartford which accepted its responsibility of coverage to its insured—

may defeat settled Illinois principles requiring equitable proration of the loss among responsible carriers. Hartford may recover from Argonaut only the excess it paid over the equitable share it should have paid.[12] Thus the assignment from Rosenberg to Hartford was, we believe, against the public policy of Illinois.

Determining a carrier's pro rata share is often extremely difficult. As the Seventh Circuit stated, "[f]ew areas in the field of insurance law give courts and parties more difficulty than that of duplicating or overlapping insurance." *Home Ins. Co. v. Certain Underwriters at Lloyds London*, 729 F.2d 1132, 1133 (7th Cir.1984).

■ Apportionment of loss between two or more insurance policies covering the same loss is done according to terms of the applicable policies. *Kern v. Michigan Mut. Liab. Co.*, 129 Ill.App.2d 423, 263 N.E.2d 134, 136 (4th Dist.1970). If the terms of the policies determining the effect of the existence of other insurance covering the loss (generally called "other insurance" clauses) are compatible, effect is given to all the clauses. *Putnam v. New Amsterdam Ins. Co.*, 48 Ill.2d 71, 269 N.E.2d 97, 100 (1970). When the "other insurance" clauses are incompatible, they are declared mutually repugnant and the loss is apportioned between the carriers pro rata. *See* Couch on Insurance 2d (Rev. ed. 1983) § 62:6.

Generally there are three types of "other insurance" clauses: the "pro rata clause," the "excess clause," and the "escape clause." *Putnam*, 269 N.E.2d at 99. The typical pro rata clause provides that when an insured has other insurance available, the company will be liable only for the proportion of the loss represented by the ratio between its policy limit and the total

---

probate case; it merely stated the general rule of assignment law. *Aabye* involved an assignment by an insured to one of the insured's creditors. In *Maneikis, Browning* and *Brown*, the insured assigned a cause of action against his insurer to the injured party.

**12.** Of course, if all insurers acknowledge their obligations, and work out an arrangement whereby one insurer pays more than its pro rata

share of the judgment as determined by the terms of the policies, then the courts would respect the settlement contract arrived at through arms-length bargaining. This is not such a case, however, because Argonaut did not acknowledge its obligation to Rosenberg until after a settlement had been achieved and Hartford had paid an "extra" $1,000,000.

limits of all available insurance. *Id.* Argonaut's Primary Policy contained a pro rata clause.[13] The escape clause holds the policy null and void with respect to any hazard as to which other insurance exists. *Id.* No policy in the record contains an escape clause. The excess clause allows coverage only over and above other insurance. *Id.* Rosenberg's policy with Argonaut contained an excess clause,[14] as did the Umbrella Policy.[15]

The policies issued by Hartford to Broder and Rosenberg are not in the record. While our inability to examine these insurance policies would normally make it impossible for us to apportion liability on summary judgment, in the present case we can do so by making two assumptions and drawing some reasonable inferences from the evidence which is in the record. First, we assume that Rosenberg's policy with Hartford offered primary coverage which prorates with other available primary insurance.[16] Second, we assume that Hartford offered $3,000,000 in primary coverage for Broder which prorates with other primary coverage.[17] With these two assumptions, we can decide this case on summary judgment.

There are two kinds of policies in the instant case. Those with primary insurance (Northwest's $1,000,000 policy with Argonaut, Rosenberg's $1,000,000 policy with Hartford, and Broder's $5,000,000 policy with Hartford), and those with excess insurance (Northwest's $2,000,000 Umbrella Policy with Argonaut and Rosenberg's $1,000,000 policy with Argonaut). As between these two kinds of insurance, the limits of the primary insurance must be exhausted before the excess insurance becomes collectible. *Whitehead v. Fleet Towing Co.,* 110 Ill.App.3d 759, 66 Ill.Dec. 449, 442 N.E.2d 1362, 1366 (5th Dist.1982). As between the insurers within each type of coverage, coverage is apportioned according to the total limits of the policies within that type.[18]

---

**13.** The Primary Policy provides:

The insurance afforded by this policy is primary insurance except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the *insured* has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) *Contribution by Equal Shares.* If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) *Contribution by Limits.* If any such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability

of all valid and collectible insurance against such loss.

(Condition 6) (emphasis in original).

**14.** *See* n. 3, *supra.*

**15.** *See* n. 5, *supra.*

**16.** Hartford consistently treated Rosenberg's policy as primary (Murphy Dep. 45) and Hartford was always willing to pay the limits of the Rosenberg policy before other coverage was paid (Groark Aff. ¶ 9).

**17.** We note that Murphy acknowledged a total of $10,000,000 in coverage for Broder (Murphy Dep. 7). In order to simplify matters, we shall assume that only one of Broder's policies offered coverage for the *Tannebaum* loss, as our conclusion is the same whether Broder had $5,000,000 or $10,000,000 in available coverage. Furthermore, we assume that Broder's coverage prorated with other primary coverage since there is no indication in the record that Broder had any coverage with any other insurer.

**18.** We note that there is authority to support an alternate conclusion that an Umbrella Policy offers secondary coverage to a policy with an "excess" clause. *Illinois Emcasco Ins. Co. v. Continental Cas. Co.,* 139 Ill.App.3d 130, 93 Ill. Dec. 663, 487 N.E.2d 110 (1st Dist.1985). We realize that *Illinois Emcasco* conflicts with an earlier case from the Seventh Circuit, *Home Ins. Co. v. Certain Underwriters of Lloyds, London,*

In the present case, the total amount of coverage offered by the three primary policies was $7,000,000. Since $7,000,000 is less than the settlement of $8,000,000, each policy offering primary coverage must be fully exhausted before any of the policies offering excess coverage can be touched. Therefore, proration requires that 100% of the limits of the Broder policy and the Rosenberg policy with Hartford be paid in full. Hartford's pro rata share thus equals $6,000,000. Since Hartford has paid only $5,000,000 (including the $1,000,000 for the assignment), Hartford has paid less than its pro rata share and may recover nothing from Argonaut. Even if we considered Rosenberg's policy with Argonaut as primary insurance, Hartford would still be required to pay 100% of the limits of the Broder policy and its Rosenberg policy.

The only scenarios whereby Hartford could legitimately claim it had paid more than its fair share would be where the policies issued by Hartford to Broder were excess policies prorated with the Umbrella Policy, or where the Umbrella Policy was a primary policy prorated with the other primary policies. Since the Umbrella Policy explicitly states it is an excess policy, and there is no evidence in the record to disturb our assumption that at least one Broder policy offered primary rather than excess coverage, we are confident that Hartford has paid nothing in excess of its pro rata share.[19]

### Conclusion

Summary judgment for Hartford is denied; summary judgment for Argonaut is granted.

729 F.2d 1132 (7th Cir.1984). We offer no resolution of the question raised by this note at this time.

19. To the extent Argonaut agreed to contribute $3,000,000 towards settlement of the *Tanneb-*

*aum* suit, it is contractually bound to pay that amount. Argonaut may not resort to the courts to recover any excess it may have paid. *See* Couch on Insurance 2d (Rev. ed. 1983) § 62:23.