HARTFORD CASUALTY INSURANCE
COMPANY, Plaintiff–Appellant,

v.

ARGONAUT–MIDWEST INSURANCE
COMPANY, Defendant–Appellee.

No. 87–2240.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1988.

Decided Aug. 19, 1988.

Rehearing and Rehearing En Banc
Denied Nov. 4, 1988.

Aaron J. Kramer, Schiff Hardin & Waite,
Chicago, Ill, for plaintiff-appellant.

Stanley A. Walton, III, Winston &
Strawn, Chicago, Ill., for defendant-appel-
lee.

Before CUMMINGS, CUDAHY, and
POSNER, Circuit Judges.

POSNER, Circuit Judge.

This diversity lawsuit between two insur-
ance companies is the sequel to a misfor-
tune that occurred more than a decade ago.
In 1975 Mrs. Tannebaum became a quadri-
plegic after an operation at Northwest
Hospital in Chicago to straighten her nose.
She and her husband brought a malpractice
action in an Illinois state court against the
surgeon, Dr. Broder; the anesthesiologist,
Dr. Rosenberg; a nurse; and the hospital.
Hartford Casualty Insurance Company had
insured Dr. Broder for $10 million ($5 mil-
lion on him personally, $5 million on his
professional corporation) and Dr. Rosen-
berg for $1 million, and it agreed to defend
both doctors against the Tannebaums' suit.
Argonaut–Midwest Insurance Company
had issued two policies to Northwest. One
insured the hospital for $1 million and phy-
sicians employed by the hospital for $1
million each. The other provided an addi-
tional $2 million in insurance for the hospi-
tal alone; this was an "umbrella" policy,
and required Northwest to exhaust all oth-
er sources of insurance before it could
make a claim under it. Argonaut–Midwest
agreed to defend Northwest Hospital, but
refused to defend Dr. Rosenberg, on the
ground that he was not an employee of the
hospital.

The Tannebaums' suit went to trial in
1981. The judge ruled that Dr. Rosenberg
was, as a matter of law, an employee of the
hospital. The jury returned a verdict for
the Tannebaums of $9 million against three
of the defendants (all but the nurse, whom
the jury exonerated). The defendants' lia-
bility was joint and several, meaning that
each was liable for up to the full $9 million,
although the Tannebaums could not, of
course, recover more than that amount in
total from the defendants. Judgment was
entered on the verdict, and no appeal was
taken. The judgment had now to be paid.
Dr. Broder, with his $10 million in insur-

ance from Hartford, had nothing to fear; Northwest, with its $3 million in insurance from Argonaut–Midwest, had little to fear; but Dr. Rosenberg, with only $1 million in acknowledged coverage (from Hartford), was concerned that the Tannebaums might go after his personal assets. His concern mounted when the Tannebaums instituted postjudgment proceedings to discover what assets he might have that could be used to satisfy the judgment. He retained counsel, who wrote Argonaut–Midwest (this was a month after the trial had ended) demanding that it acknowledge its coverage of Dr. Rosenberg and threatening to sue it for compensatory and punitive damages (the latter for Argonaut–Midwest's alleged bad faith in denying coverage) if execution of the judgment forced Rosenberg into bankruptcy. Argonaut–Midwest replied that Rosenberg was not an employee of Northwest Hospital and therefore was not covered by the policy that it had issued to the hospital.

Negotiations ensued between the insurance companies and the Tannebaums' lawyer, who, perhaps foreseeing possible difficulties in collecting the full judgment, agreed to take $8 million in satisfaction of it. Argonaut agreed to put up $3 million, on behalf of Northwest Hospital, and Hartford agreed to put up $4 million—$3 million on behalf of Dr. Broder and $1 million, the policy limit, on behalf of Dr. Rosenberg. But that left $1 million. Fearing that Dr. Rosenberg would be left holding the bag, his lawyer turned to Hartford, which on June 18 agreed to contribute another $1 million to the pot in exchange for an assignment of Rosenberg's claim against Argonaut–Midwest. Cf. *Maneikis v. St. Paul Ins. Co.*, 655 F.2d 818, 826 (7th Cir.1981). With Hartford now offering the Tannebaums $5 million and Northwest sticking by its previous offer of $3 million, the Tannebaums' suit was finally settled and Hartford then brought this diversity suit against Argonaut–Midwest for $1 million.

Since Argonaut–Midwest now acknowledges, contrary to its earlier position, that Dr. Rosenberg was an employee of Northwest Hospital at the time of the disastrous operation on Mrs. Tannebaum, and since, therefore, Dr. Rosenberg had a good claim against Argonaut–Midwest for refusing to acknowledge coverage of him, it might appear that Hartford's claim as Rosenberg's assignee would be unassailable. Yet the district judge granted summary judgment for Argonaut–Midwest, 664 F.Supp. 373. He did so on the ground that the assignment was against the public policy of Illinois, which requires, in cases where the same person is insured by different insurance companies, that the allocation of liability among those companies satisfy the principle of equitable contribution. See *Pekin Ins. Co. v. Cincinnati Ins. Co.*, 157 Ill.App. 3d 404, 109 Ill.Dec. 656, 510 N.E.2d 524 (1987); *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.*, 145 Ill.App.3d 175, 197, 98 Ill.Dec. 512, 526, 494 N.E.2d 634, 648 (1986); *Royal Globe Ins. Co. v. Aetna Ins. Co.*, 82 Ill.App.3d 1003, 38 Ill.Dec. 449, 403 N.E.2d 680 (1980); *Home Ins. Co. v. Certain Underwriters at Lloyd's*, 729 F.2d 1132, 1134 (7th Cir.1984) (applying Illinois law). In determining what would be an equitable contribution, the judge made a distinction between primary and secondary coverage, treating the $5 million policy that Hartford had issued to Dr. Broder's professional corporation, the $1 million for which Argonaut–Midwest had insured Dr. Rosenberg as an employed physician of Northwest Hospital, and the $2 million umbrella policy that Argonaut–Midwest had issued to the hospital as secondary. That meant there had been a total of $7 million in primary coverage (Hartford's $5 million policy on Dr. Broder and $1 million policy on Dr. Rosenberg, and Argonaut–Midwest's $1 million policy on Northwest Hospital), of which Hartford had held $6 million, or 6/7. Even after contributing an extra $1 million in exchange for Rosenberg's assignment, Hartford had contributed only $5 million to the pot, or 5/8 of the total; and 5/8 (62.5 percent) is less than 6/7 (85.7 percent). Therefore, the judge concluded, it would be inequitable to allow Hartford to recover $1 million from Argonaut–Midwest, since this would reduce Hartford's share from 5/8 to 1/2. And, he added, his conclusion would have been the

same if Argonaut–Midwest's policy on Rosenberg had been primary rather than secondary, for in that event Hartford would still have held ¾ of the primary coverage yet have paid less than that fraction of the total settlement with the Tannebaums.

There is no reported case like the present one, and we must therefore base our decision on first principles. Although ordinarily we give significant deference to the district judge's interpretation of the law of the state in which he sits, see, e.g., *Beard v. J.I. Case Co.*, 823 F.2d 1095, 1097 (7th Cir.1987); *City of Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987), this precept has little force in the present case. There are no Illinois cases on point; the district judge did not discuss such Illinois cases as might bear on the question although not dictate the answer; and the parties, in their search for authority, have ranged over the whole United States.

We begin with a presumption in favor of enforcing contracts between competent adults, which seems a fair description of the assignment by Dr. Rosenberg of his rights against Argonaut–Midwest to Hartford in exchange for Hartford's agreeing to contribute another $1 million to the fund available for satisfying the Tannebaums' claim. The mutual advantages of the assignment are apparent. Rosenberg protected his personal assets, Hartford limited its liability (for if the settlement had fallen through the Tannebaums might have gone after Dr. Broder's assets, in which event Hartford would have had to cough up more than $3 million on his account), and the Tannebaums obtained a satisfactory settlement without having to engage in potentially costly efforts. Argonaut–Midwest lost, of course, but had itself to blame for having stubbornly refused to acknowledge that the policy it had issued to Northwest Hospital covered Dr. Rosenberg for up to $1 million.

Against this conclusion Argonaut–Midwest levels only two arguments that merit discussion. The first is that an insured should not be allowed to assign a claim that it has against one insurance company to another insurance company. Argonaut–Midwest concedes that it would have been proper for Dr. Rosenberg to have assigned his claim to the Tannebaums. Such assignments are common. (Besides the *Maneikis* case cited earlier, see *Green v. J.C. Penney Auto Ins. Co.*, 806 F.2d 759 (7th Cir.1986); *Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 444 (7th Cir.1986).) The Tannebaums, however, might not have wanted to bear the costs of suing Argonaut–Midwest; their willingness to accept $8 million in discharge of a $9 million judgment reflected a preference for all cash, now, rather than some cash now plus a claim that could found a second lawsuit. So it made more sense for Rosenberg to assign his claim against Argonaut–Midwest to Hartford, in exchange for a cash contribution to the settlement pot that would take him off the hook, than to assign the claim to the Tannebaums. Argonaut–Midwest counters that if insurance companies are allowed to accept such assignments, the result will be to pit such companies against each other and consequently make it harder to settle the many cases where the defendant has coverage from more than one insurance carrier. No evidence for this proposition is offered. Cases in which insurance companies sue each other because of joint coverage are legion. See, e.g., *New Amsterdam Casualty Co. v. Certain Underwriters at Lloyds*, 34 Ill.2d 424, 431, 216 N.E.2d 665, 669 (1966); *Northbrook Property & Casualty Ins. Co. v. United States Fidelity & Guaranty Co.*, 150 Ill.App.3d 479, 103 Ill. Dec. 500, 501 N.E.2d 817 (1986); *Hartford Accident & Indemnity Co. v. Gulf Ins. Co.*, 776 F.2d 1380 (7th Cir.1985). There is no reason to believe that allowing the present case to go forward will affect the propensity of insurance companies to settle their squabbles rather than incur the costs of trials.

Often the plaintiff insurance company is suing as the subrogee of the insured; and Argonaut–Midwest neither questions the propriety of one insurance company's suing another as the insured's subrogee nor identifies any relevant difference between subrogation and assignment, both being methods by which an insured transfers his claim

to an insurance company. Argonaut–Midwest fastens on the statement in *American Nat'l Bank & Trust Co. v. Weyerhaeuser Co.*, 692 F.2d 455, 462 n. 17 (7th Cir.1982), that "assignment and subrogation are not only distinct but also inconsistent legal remedies"—but the words that follow, "when applied to the claims which Bivest and the Board could have asserted in this case," are crucial to a proper interpretation. The purported assignments in that case were invalid because made after the bank had made Bivest and the Board whole for their losses. It was therefore a case of subrogation: "the debt or claim to which the subrogee [the bank] is subrogated has been paid by the subrogee but the remedy is kept alive in equity for the benefit of the subrogee. An assignment, on the other hand, presupposes that the debt or claim has not been paid; the entire claim is transferred to another party who then prosecutes the claim in the assignor's stead." *Id.* Here there was a valid assignment; Dr. Rosenberg assigned his claim against Argonaut–Midwest to Hartford before Hartford took him off the hook, and as an inducement to Hartford to do just that. Argonaut–Midwest has not explained why it should make a difference to any issue in this case that Hartford's claim arose by assignment rather than subrogation.

In the only case we have found where one insurance company sued another as the insured's assignee, the court, far from questioning the propriety of the suit or suggesting that it would poison the adjusting of insurance claims, thought the suit a preferable alternative to forcing the insured to bring his own suit. See *St. Paul Fire & Marine Ins. Co. v. Allstate Ins. Co.*, 25 Ariz.App. 309, 543 P.2d 147, 149–50 (1976). The Illinois Appellate Court has cited *St. Paul* with approval. See *Royal Globe Ins. Co. v. Aetna Ins. Co., supra,* 82 Ill.App.3d at 1005, 38 Ill.Dec. at 451, 403 N.E.2d at 682; see also *Midwest Mutual Ins. Co. v. Indiana Ins. Co.*, 412 N.E.2d 84, 89 (Ind.App.1980); *Western Casualty & Surety Co. v. Western World Ins. Co.*, 769 F.2d 381, 383 (7th Cir.1985).

Argonaut–Midwest's stronger argument is that an assignment should not be allowed to undermine the principle of equitable contribution among insurance companies. We agree, but are left with the question of precisely what allocation of liability the principle of equitable contribution requires in the present setting. Argonaut–Midwest had contended that liability should be allocated in the ratio of the total insurance coverage available from each company for all defendants; that is, in the ratio of 11 to 4 in this case, since Hartford had insured the defendants for a total of $11 million and Argonaut–Midwest had insured them for a total of $4 million. The district judge altered the ratio to that of the respective primary coverage of the two carriers—6 to 1. This was not a satisfactory approach is only because the parties did not place all the insurance policies in the record, so that it was conjectural to treat Hartford's policy on Dr. Broder's professional corporation and Argonaut–Midwest's policy on Dr. Rosenberg as secondary. Nor can we figure out in what sense Argonaut–Midwest's $2 million umbrella policy on Northwest is secondary to Hartford's coverage of other entities. Hartford had not insured Northwest, and the terms "primary" and "secondary" (or "primary" and "excess") coverage refer to different policies on the same insured. See, e.g., *Aetna Ins. Co. v. California Union Ins. Co.*, 136 Ill.App.3d 288, 291, 91 Ill.Dec. 204, 206, 483 N.E.2d 550, 552 (1985).

The most natural approach to the question of apportionment would be to ask how, in the absence of insurance, liability would be apportioned among the three defendants. In 1977 the Supreme Court of Illinois abrogated the common law rule of no contribution among joint tortfeasors. See *Skinner v. Reed–Prentice Division Package Machinery Co.*, 70 Ill.2d 1, 13–14, 15 Ill.Dec. 829, 834, 374 N.E.2d 437, 442 (1977). The Illinois legislature responded with a statute that authorizes contribution but only for causes of action arising after March 1, 1978, see Ill.Rev.Stat. ch. 70, ¶ 301, which this one did not since the cause of action to which the statute refers is the claim in the underlying suit (the Tannebaums' suit) rather than the collat-

eral litigation over contribution, see *MFA Mutual Ins. Co. v. Crowther, Inc.,* 120 Ill.App.3d 387, 394, 75 Ill.Dec. 903, 908, 458 N.E.2d 71, 76 (1983). An argument could be made that the statute occupies the field, and somehow precludes Hartford from maintaining this suit, but Argonaut–Midwest does not make this argument—understandably. Hartford and Argonaut–Midwest are coinsurers, not joint tortfeasors (their insureds are the joint tortfeasors), and the equitable contribution among coinsurers to which the cases refer is a distinct principle from contribution among joint tortfeasors.

One could, however, imagine deeming equitable that contribution among coinsurers that mirrored the position their insureds would have occupied if the jury had been asked to allocate liability for purposes of assessing contribution among joint tortfeasors. Suppose the jury had decided that Dr. Broder had been ¾ responsible for Mrs. Tannebaum's quadriplegia and Rosenberg and the hospital ⅛ each. Then it would have been equitable to require Hartford, as Broder's insurer, to contribute $6 million of the $8 million demanded by the Tannebaums to settle their claim, Argonaut–Miller to contribute $1 million on behalf of the hospital, and the two insurance companies to split—probably 50–50 though this we need not decide (for here the issue of primary versus secondary coverage might become critical)—the $1 million representing Dr. Rosenberg's share of the settlement. As contribution was not sought, we don't know what an equitable allocation of liability among the defendants would have been, but an argument Argonaut–Midwest's counsel conceded that an equal allocation of liability among the three defendants would have been fair—would at least have done "rough justice." This is a damaging concession, for it implies that even if the assignment of Rosenberg's claim to Hartford is enforced, Hartford will have overpaid its share of the settlement; it will have paid one-half of the settlement, rather than one-third.

Argonaut—Midwest insists that, rather than have taken an assignment from Rosenberg, Hartford should have offered to pay an extra million dollars on behalf of Broder—$4 million instead of $3 million. Why should it have? There was no adjudication that Broder was 50 percent responsible for the harm to the Tannebaums, and Argonaut–Midwest has conceded as we have said that in the absence of such an adjudication equal liability among the three defendants, and hence 33⅓ percent rather than 50 percent responsibility for Broder, would be equitable. Hartford has paid more than that for Broder; it has given Argonaut–Midwest more than rough justice.

We hesitate to place the enforceability of assignments under a cloud of uncertainty by allowing vague concepts of equitable contribution to be used to defeat such assignments. We can see nothing unfair or inequitable in Hartford's behavior. It helped an insured, Rosenberg, out of a hole even though it had already tendered the full limit ($1 million) on its policy for Rosenberg. It averted postjudgment proceedings against all the defendants. It enabled a $9 million judgment to be satisfied at a cost of only $8 million. It will have paid half that amount. Maybe in other circumstances the assignment to an insurance company by an insured of a claim against another insurance company would be inequitable and unenforceable, but we shall await a case presenting such circumstances before we rule that such assignments are improper, either in general or in a case such as this where the assignment enables the assignee to shift to the other company a part of the burden of satisfying the joint obligations of the company to the insured.

The district judge granted summary judgment for the defendant and ordinarily the result of a reversal would be to return the case to the district court for a trial or other proceedings on liability. This is so even when the plaintiff had moved for summary judgment too. See, e.g., *May v. Evansville-Vanderburgh School Corp.,* 787 F.2d 1105, 1115 (7th Cir.1986); *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 349 (7th Cir.1983). In this case, however, the parties do not want a trial or other proceed-

ings in the district court. Hartford has asked us to direct the entry of judgment in its favor, and Argonaut–Midwest has not suggested that this is an improper request if we reverse the district court. We therefore reverse the judgment of the district court and remand with directions to enter judgment in favor of Hartford. Cf. *American Nat'l Bank & Trust Co. v. United States*, 832 F.2d 1032, 1036 (7th Cir.1987); *May v. Evansville–Vanderburgh School Corp., supra*, 787 F.2d at 1115–16.

REVERSED, AND REMANDED WITH DIRECTIONS.